No. 82-58

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

RON JOHNSON and MARILEE JOHNSON,

Plaintiffs and Respondents,

vs.

DANIEL S. MURRAY,

Defendant and Appellant.

Appeal from: District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

George T. Radovich argued, Billings, Montana

For Respondents:

McDonough, Cox and Simonton, Glendive, Montana
Richard Simonton argued, Glendive, Montana

Submitted:  September 13, 1982

Decided:  December 21, 1982

Filed: DEC 21 1982

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Daniel S. Murray appeals from a judgment by default entered against him in the Fifteenth Judicial District Court, Roosevelt County, awarding general damages of $100,000, punitive damages of $100,000, attorney fees of $1,500 and costs in favor of the plaintiffs Ron and Marilee Johnson. We affirm.

Murray raises two issues: (1) that he was deprived of due process in the entry of his default and the granting of the default judgment, and (2) that the damages awarded are excessive.

On September 3, 1980, highway patrolman Duane Bratland, an officer under the supervision of plaintiff Ron Johnson, issued a daytime speeding ticket to Murray in Dawson County. The maximum fine for the speeding charge was $5.

On September 30, 1980, Murray responded to the ticket by filing in the Justice Court a document entitled "Counterclaim". In it he accused Ron Johnson, Marilee Johnson and others of "intimidation of private citizens, compounding a felony, attempting to take money under false pretenses, using unauthorized police powers, operating a radio transmitter without a FCC license, failure to display FCC license, vexing and harassing." He demanded damages from the defendant of $1,050,007, plus court costs and attorney fees at $100 per hour. The justice of the peace dismissed Murray's counterclaim for lack of jurisdiction.

About the time of the dismissal in Justice Court, Murray filed with the clerk and recorder of Roosevelt County, where the Johnsons resided, documents entitled "Notice and Demand," and "Memorandum of Law" which purported to be

-2-

liens upon the Johnsons' real property. At about the same time, Murray approached local banks with another "Notice and Demand" entitled "Claim of Common Law Writ of Attachment with Memorandum of Law" and attempted to attach or detain the Johnsons' checking and savings accounts along with any of their stocks, bonds and safe deposit boxes.

On December 2, 1980, Johnsons' attorney wrote to Murray, demanding that the purported liens be removed within ten days or suit would be filed. Murray responded to this letter with a "Declaration of Notice and Demand" which essentially repeated and demanded compliance with the purported liens.

On May 27, 1981, Johnsons brought this action against Murray, asking for damages for slander of title, defamation, violation of their rights to privacy and their right to own property. The Johnsons requested general damages, punitive damages, costs and attorney fees.

Summons was served on Murray in Yellowstone County on June 3, 1981.

On June 24, 1981, the clerk of the District Court in Roosevelt County received in the mail from Murray an instrument entitled "Answer to Complaint, Special Appearance, Offer to Release Liens." Murray, however, did not submit the necessary $10 filing fee. On the date of receipt, the clerk of the District Court mailed to Murray a bill for the $10 filing fee, meanwhile holding the "Answer" without filing the same. Murray had served his answer upon the Johnsons, but not upon their attorney.

On August 28, 1981, the attorneys for the Johnsons filed with the clerk of the District Court their written request for the entry of Murray's default for his failure to plead or otherwise defend as provided by law.

On September 1, 1981, the attorneys for the Johnsons served written notice of application for default judgment upon Murray, and filed the original with the clerk of the court, that on September 29, 1981, at 11:00 a.m., in the Roosevelt County courthouse, the plaintiffs would present testimony regarding the extent of their damages in the matter, because of Murray's default.

On September 11, 1981, Murray sent the $10 filing fee to the clerk of the District Court, who thereupon filed the "Answer" in the court file.

On September 16, 1981, Richard A. Simonton, as attorney for the Johnsons, filed an affidavit for entry of default to the effect that the defendant had been served on June 3, 1981, that the time for the entry of his answer had expired, and that he had not answered or otherwise moved for extension of time to answer. On September 16, 1981, the default of Murray was entered in the case.

On September 28, 1981, the day before the time scheduled for the hearing on the entry of judgment by default, Murray filed in the District Court an instrument entitled "Notices; Special Appearance; Display of Bad Faith; Request for Voluntary Dismissal; Demand for Jury Trial."

On September 29, 1981, Murray did not appear in person or by counsel for the hearing on the entry of judgment by default. At 20 minutes past the appointed time for the hearing, the District Court proceeded to take testimony from the Johnsons with respect to the amount of damages. Witnesses included Roger Wimmer, an abstractor from Wolf Point, Montana, and the plaintiffs Ron Johnson and Marilee Johnson. In its findings, the District Court found the procedures substantially as we have recited them foregoing;

-4-

determined that the Johnsons were required to retain counsel for the purpose of protecting their rights and to remove the cloud upon the title of their real property created by the filing of the liens; that such liens did cloud the title to Johnsons' real property; that the Johnsons were not guilty of intimidation, compounding a felony, taking money under false pretenses, using in an unauthorized manner their police powers, nor had they vexed or harassed Murray; that they had no personal contact with him, and were not involved in the issuance of or the enforcement of the citation issued to him on September 3, 1980; that Marilee Johnson in particular did nothing to abuse the defendant and had no connection other than being the subject of his attack by way of liens. The District Court concluded that the placement and retention by Murray of the alleged common law liens against the Johnson property in Roosevelt County slandered the title and caused a cloud upon it, reducing its value and saleability; that the counterclaim was a public document and available for public inspection and it charged the Johnsons with the commission of crimes which were false, untrue and damaging statements, and were libelous per se with regard to the reputation, business and standing of the Johnsons in the community; that the liens and writs of attachment by Murray were intentional attempts to harass, embarrass and intimidate the Johnsons without statutory or case authority and violated the Johnsons' right to privacy and to own or possess property and hindered and obstructed the Johnsons' personal rights; that the alleged common law liens were void without recognition in Montana case law or statutory law and should be stricken from the record; that the plaintiffs had incurred attorney

-5-

fees of $1,500, plus additional costs in prosecuting the action to remove the liens. On this basis, the court entered the damages which we have recited earlier.

Following the service of the notice of entry of judgment against him, Murray moved to set aside the judgment under Rule 60(b), M.R.Civ.P. Johnsons resisted the motion on the ground that he had failed to show facts sufficient to constitute mistake, inadvertence, surprise or excusable neglect, or that he had a good defense to the complaint. The District Court on December 30, 1981, denied the motion to set aside a default judgment and the appeal to this Court ensued.

At all stages of the proceedings in the District Court, and until this appeal, Murray represented himself, acting as his own counsel in filing pleadings and documents, and conducting correspondence with Johnsons' attorney.

WAS THE DEFAULT JUDGMENT AGAINST MURRAY PROPER?

Defaults are controlled by Rule 55, M.R.Civ.P. The pertinent parts of that rule follow:

> "Rule 55(a). Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his default.

> "Rule 55(b). Judgment. Judgment by default may be entered as follows:

> "(2) By the court. In all other cases the party entitled to a judgment by default shall apply to the court therefore; . . . If the party against whom judgment by default is sought has appeared in the action, he . . . shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application. If . . . it is necessary to take an account or to determine the amount of damages . . . the court may conduct such hearings . . . as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute in the state of Montana.

"Rule 55(c), Default--setting aside--extension of time by court or stipulation of parties. For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b). No default of any party shall be entered, and no default judgment shall be entered against any party, except upon application of the opposing party . . . In any case if a party in default shall serve and file his appearance, motion pleading or proceeding prior to application to the clerk for default, then such defaulting party shall not thereafter be considered in default as to that particular appearance . . ."

Under Rule 55, it is clear that the entry of default by the clerk and the entry of judgment by the District Court are two distinctly different acts. Sealey v. Majerus (1967), 149 Mont. 268, 271, 425 P.2d 70. In that case we said:

"Reference to Rule 55(a) clearly points out the error in defendants' contentions one and three. Entry of default by the clerk requires no notice to the party in default. Entry of default IS NOT a judgment. It is only a step in the process of securing judgment by default . . ." 149 Mont. at 271.

In this case, although Murray had forwarded an answer by mail to the clerk of the District Court, which was received by the clerk on June 24, 1981, he did not at the same time tender or pay the $10 filing fee required.

Under section 25-1-201, a clerk of the District Court is required to collect from each defendant or respondent on his appearance the sum of $10. The clerk is required to deposit 40 percent of such fees in the general fund of the county, and the remaining portion is remitted to the State. Under section 25-10-403, each party to a civil action is required to pay the fees fixed by law for the performance of any service or duty by any officer of the court, and the officer may not be required to perform such service or duty until the fees fixed are on demand first paid or tendered. Under section 7-4-2515, MCA, county officers, including the

-7-

clerk of the court must not in any case perform any official services unless the fees prescribed for such services are paid in advance. It was proper in this case, therefore, for the clerk of the District Court to hold the proffered answer of Murray in suspense and not file the same until the officially required fee had been tendered or paid.

Because Murray's answer had not been filed within the time required, after service of the summons and complaint upon him, it was proper for the plaintiffs to request the entry of his default and to make application therefor on August 27, 1981. The application for his default was made prior to the filing of his answer on September 11, 1981. Under Rule 55(c), quoted above, any party in default must serve and file his appearance prior to the application to the clerk for default.

Since application for the entry of default by the clerk was timely made by the Johnsons, through their attorney, the District Court clerk was correct in entering the default of Murray on September 16, 1981, upon receipt of the affidavit that no answer or appearance had been made as required by law by Murray at the time of the application for default.

Johnsons gave written notice to Murray that they would apply to the District Court for judgment by default in plenty of time and certainly in compliance with Rule 55(b)(2), M.R.Civ.P. The time for hearing was set for September 29, 1981. Neither Murray nor anyone representing him appeared at the hearing for the purposes of establishing damages under Rule 55(b)(2). There was no reason for the District Court not to proceed to take evidence for the purpose of determining damages.

On the day before the hearing, September 28, 1981, Murray had filed his "Notice, Special Appearance." There

-8-

is no provision for the filing of any such pleading in the Rules of Civil Procedure. His purported pleading included a demand for jury trial. When a party is in default, he has no statutory or constitutional right to have a jury assess the damages. Even if the court utilized, in the exercise of its discretion, a jury to assess the damages, it is not because of the protection of the Seventh Amendment, but to inform the conscience of the court. 5 Moore's Federal Practice (2d ed.), § 38.19[3].

Having determined that the proper procedures were followed by counsel for the Johnsons and by the District Court in proceeding and entering default judgment, we now consider whether the District Court ruled properly in refusing to set aside the default judgment upon motion of Murray.

Rule 55(c), M.R.Civ.P., provides that if a judgment by default has been entered, it may be set aside in accordance with Rule 60(b), M.R.Civ.P. Under Rule 60(b), the grounds set out and relied on by Murray were "mistake, inadvertence, surprise, or excusable neglect." Murray contends that his failure to submit the required filing fee was an inadvertent mistake, and that he had not received from the clerk of the court the bill for the fee which she mailed on June 11, 1981. He also contended that since he was appearing pro se that he should be held to much less stringent standards than applied in cases where attorneys are representing the parties.

In denying the motion of Murray to set aside the default judgment, the District Court agreed with the Johnsons that Murray's negligence was not excusable in his failure to pay the filing fee until 2 1/2 months later and after the request to enter his default had been submitted; that he had failed to present a prima facie meritorious defense in the answer and

-9-

that the evidence indicated overwhelmingly that he had no defense to the actions for libel and slander of title. Although Murray was acting as his own attorney, the District Court found that his reckless disregard for the rights and feelings of the plaintiffs and his further attempt at that stage to prolong the litigation were adequate reasons to deny his motion to set aside the judgment.

The District Court relied on Mihelich v. Butte Electric Railway Company (1929), 85 Mont. 604, 622, 281 P. 540, 547, wherein this Court said:

> "Mere forgetfulness or a mistake such as indicated is not ground for setting aside a default. (Citing cases.) When one is in default and applies to the court for relief, he must bring his case within some one of the grounds given in [Rule 60(b), M.R.Civ.P.] but even then relief is granted only as a matter of grace and cannot be demanded as a matter of right; in other words, the statute refers the matter to the sound legal discretion of the trial court and its ruling will be interfered with only when a showing of manifest abuse of that discretion is made."

In the circumstances here we find that the District Court did not abuse its discretion in refusing to set aside the default judgment against Murray.

As a further ground for refusing to set aside the default judgment, the District Court noted that Murray, although notified, chose not to appear at the hearing for the entry of judgment by default, there to offer any mitigating evidence he may have had with respect to damages.

IS THE EVIDENCE SUFFICIENT TO SUSTAIN THE VERDICT?

Insufficiency of the evidence to justify the verdict or other decision is ordinarily a ground for a motion for a new trial in the District Court. Section 25-11-102, MCA. Murray made no motion for a new trial in the District Court and perhaps under the posture of the pleadings here he could not

-10-

have done so. In any event, denial of a motion for a new trial is not an appealable order (Rule 1, M.R.App.Civ.P.). When a case comes before this Court where a motion for a new trial has not been made, this Court will review the evidence to determine whether there is any substantial evidence to justify the verdict. Harrington v. H. D. Lee Mercantile Company (1934), 97 Mont. 40, 55, 33 P.2d 553.

A judgment for damages must be supported by substantial evidence. Bjerum v. Wieber (1967), 149 Mont. 375, 427 P.2d 62. The damages awarded must be reasonable. Section 27-1-302, MCA. When there is strong evidence of the fact of damage, defendant should not escape liability because the amount of damage cannot be proven with precision. Winsness v. M. J. Conoco Distributors (Utah 1979), 593 P.2d 1303. The law does not require that any witness should have expressed an opinion as to the amount of damages that would compensate for humiliation, distress, or embarrassment. The law requires only that the trier of fact exercise calm and reasonable judgment, and the amount of award rests of necessity in the sound discretion of the trier of fact. Bourke v. Butte Electric and Power Company (1905), 33 Mont. 267, 83 P. 470; Freddy L. Johnson and Clara Johnson v. United States of America v. Timothy B. Hay (U.S.D.C. 1981), CV 77-20-GF, 38 St.Rep. 599, 604.

To sustain an award of punitive damages against the objection that the evidence is insufficient, there must be substantial evidence in the record of oppression, fraud or malice, actual or presumed, toward the plaintiff, where the punitive damage award is given for the sake of example and by way of punishing the defendant. Section 27-1-221, MCA.

-11-

Here Murray, in response to receiving a ticket for a highway violation, for which the maximum fine was $5, filed in the Justice Court his "counterclaim" against several defendants, including the Johnsons, charging intimidation of private citizens, compounding a felony, attempting to take money under false pretenses, using unauthorized police powers, operating a radio transmitter without an FCC license and failure to display an FCC license. This purported counterclaim was for the sum of $1,050,007, plus court costs and attorneys at $100 per hour.

When his counterclaim was dismissed, he then prepared and filed a "notice and demand" purporting to be a common law lien on the personal property, crops, machinery, cars, trucks, household goods, wills, estates, equity liens and trusts of the respondents. He filed a "notice and demand" containing a memorandum of law, in which he gave notice that he intended to secure money damages and exercise his civil and constitutional rights against the Johnsons, and that he would claim a lien upon the real property in Wolf Point, owned by the Johnsons. Here again, the demand was for $1,050,007. He then gave notice to "all banks in the State of Montana" and delivered to several banks, a "notice and demand" purporting to be a claim of common law writ, asserting a lien upon the checking accounts, savings accounts, stocks, bonds, and safe deposit boxes of the Johnsons, attaching the same "instantor" and requiring the banks to hold such items as security not to release the same until his action was settled in a court of competent jurisdiction "under the common law." On December 8, he delivered to the attorneys for the Johnsons a declaration of notice and

-12-

demand informing the attorneys that he had "liened" the property, bank accounts and hand signatures of the Johnsons as a claim for the violation of his "unalienable rights" which liens he said shall remain in force for 100 years and would only be removed by him when damages had been paid or a settlement to his satisfaction reached. He claimed "your property cannot be sold, your bank accounts cannot be touched, and your hand signatures, marks and brands, trademark, may not be lawfully affixed or used by yourselves, agents, attorneys, commissioners or executors until the release of each lien by myself."

At the hearing for damages, a licensed abstractor testified that the imposition of the purported lien cast a cloud on the title of the real property of the Johnsons which would require at least the expense of removing the same and that the market value of the Johnson property was thereby reduced. Both the Johnsons testified to the humiliation, embarrassment, distress and ridicule each felt as they went to the banks to explain that the lien should have no effect against them and their property, and the necessity they felt to explain to their neighbors and fellow residents in their county that the purported counterclaims against them had no basis in law or in fact.

The District Court was particularly impressed with the attack on Marilee Johnson, the wife of Ron Johnson, who could have had no connection with the issuance of the speeding charge against Murray and whose inclusion as an object of Murray's lien campaign seemed particularly vengeful and improper.

Although opportunity was given to Murray to dismiss and discharge the purported lien claims in exchange for a dismissal

of the Johnsons suit against him, he declined that offer.

In his "special appearance" filed the day before the damage hearing, on September 28, 1981, he insisted that Johnson should "negotiate" with him to release the liens, and repeated his offer to release the liens stated in his earlier, late filed answer; that he would be "willing to discuss with Mr. Johnson a release of the liens if he would choose to negotiate privately with the defendant."

Murray claims he did not receive a bill from the clerk of the court for the filing fee, mailed to him on or about June 24, 1981. His denial, however, is refuted by the letter from the clerk of the court mailed to Murray in which the clerk stated that a bill had in fact been mailed to him on that date and that she had no response from him to the bill.

It is clear from the record, therefore, that Murray has, without cause or justification, affected the market value of the Johnsons real property, interfered with their use of their private property, falsely charged them with the commission of crimes, and purposely subjected the Johnsons to embarrassment, distress, humiliation and ridicule. He disregarded the bill of the county clerk for the filing of his answer until default had been applied for against him. He ignored a notice that a hearing for damages against him would be held and failed to appear at the hearing. He had shown utter disregard for the rights and privacy of the Johnsons, and utter disdain for the proceedings in the courts. His documents and actions against the Johnsons evince malice, both actual and presumed, and sustain the award of punitive damages against him. We cannot find that the District Court, in awarding general damages, acted unreasonably, and without the exercise

-14-

of common deliberate judgment, nor that the general damages in the circumstances are unreasonable. There is sufficient evidence in the record to sustain the awards of damages, both general and punitive, and the attorneys fees and costs.

It seems pertinent for us to comment especially on the language of the statute, section 27-1-221, MCA, allowing the award of exemplary damages "for the sake of example." While we feel that the defendant was misguided (by what or by whom we cannot know) in his interpretation of the law and the role of the courts, he aggravated that misguidance by deliberate, unprincipled actions which no society governed by law and not by men could tolerate. We have had other examples in recent years of persons asserting dark and ominous common law rights superseding our constitutions and our statutes. The attorney general of this state has been called upon to issue an opinion that nonstatutory "common law liens" filed against public officers on the mere whims of the claimed lienors are invalid, and to instruct county clerks and recorders not to accept the same for filing. There is a need for example against this kind of lien claims.

Affirmance of the exemplary damages in this case may well alert those inclined to follow the example of Daniel Murray--they may well be traveling a rocky road.

Affirmed.

John C. Sheehy
Justice

-15-

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-16-

Mr. Frank B. Morrison, Jr., dissenting:

I respectfully dissent.

I concur in that portion of the majority opinion which affirms the cause of action and the award of punitive damages. There is substantial credible evidence from which the trial court could have found malice and upon which the trial court could have made an award of $100,000 in punitive damages by way of example.

I dissent from the majority in affirming the award of $100,000 in compensatory damage. In my opinion the record does not show actual damages which could conceivably support the compensatory award made by the trial court.

The record of the default proceedings held in the trial court shows the following testimony bearing upon compensatory damages.

ROGER WIMMER, ABSTRACTOR

"Q. Now do you have an opinion, in your capacity as an abstractor, as to whether or not such a lien would be a cloud on the title to the Johnson property?

"A. Yes I do.

"Q. And what is your opinion?

"A. In my opinion it would definitely put a cloud on the title.

". . .

"THE COURT: And to a prospective purchaser that would appear to be a big question mark, wouldn't it?

"A. Yes."

RON JOHNSON, PLAINTIFF

"Q. Now these liens that have been filed by Mr. Murray, how has that affected you?

"A. I was very angry to begin with, and I am still a little put out about it, and I think a lot of people knew about it long before I did, that these liens had been filed, and there has been a lot of ribbing about it, and people still kind of look at you with such a jaundice eye and 'Well if you are so innocent, what are you doing in Court?'

-17-

or 'Why did this guy file this lien on you?', and
I think the biggest problem is the drawn out
explanation that has to take place in order to
hopefully satisfy your friends that you really
haven't done anything wrong."

MARILEE JOHNSON, PLAINTIFF

"Q. Mrs. Johnson, how has this matter affected
you?.

"A. I think it has been very embarrassing.

"Q. In what ways?

"A. Well, sometimes my husband talks about
finding another job and -- or maybe transfer-
ring and if we were to move, we would have
problems trying to sell our property for one
thing and the idea of somebody controlling your
bank account is very upsetting, and it would
be very hard for us to manage things that way;
I think the whole thing is terrible and I have
been very annoyed when I heard that a lien was
put on our property of that kind, because I
didn't know that anyone could do that."

This is the extent of the testimony bearing upon damages

to the plaintiffs. The majority opinion states:

"At the hearing for damages, a licensed
abstractor testified that the imposition
of the purported lien cast a cloud on the
title of the real property of the Johnsons
which would require at least the expense
of removing the same and that the market
value of the Johnson property was thereby
reduced."

I find no support in the record to show a diminution in

the market value of the Johnson property. Furthermore, there

is no evidence that the Johnson property was ever offerred

for sale during the time in question. With the exception of

testimony regarding plaintiff's embarrassment and anger the

only evidence showing loss to the plaintiffs is the time that

plaintiffs personally spent in attempting to secure release

of the liens.

The conduct of the defendant is inflammatory. In my opinion

this conduct led to an award based upon passion and prejudice.

The following statements by plaintiffs' counsel and by the court

are taken from the final remarks which appear in the transcript.

MR. SIMONTON:

" . . . I believe we have shown that the title
of their property have been slandered and I
think it would be just to award one million

-18-

fifty thousand seven dollars which we have requested, but I don't know how realistic that is; I have nothing at this time to show what his worth is because he didn't appear, but when you consider that this was certainly done maliciously after we offered to forget the whole thing in December and the response was that things had to be done on his terms or not at all, and it is obvious that this was done maliciously, it has caused the Plaintiffs a great deal of concern, anguish, time and embarrassment and to punish this defendant and others like him, I would like to see a judgment of at least fifty thousand dollars, Your Honor.

"THE COURT: Well I think it might be unrealistic; I think the conduct and all its particulars, that he slandered the title and liabled and accused people of crimes that is liable per sae. There is no question in my mind that he should be punished in the way of exemplary damages. I think it might be more realistic to find damages in the amount of $100,000.00 and punitive damages in the amount of $100,000.00; . . ."

The court further awarded $1500 in attorney's fees.

A fair summary of the above quoted remarks of counsel for plaintiff show that he sought a total award of $50,000 primarily in the form of punitive damages. The court rejected request of plaintiff's counsel and awarded $200,000. The $100,000.00 awarded for punitive damages can be supported as within the trial court's discretion based upon the extremely vexatious nature of the defendant's conduct. However, I can find no evidence in the record to support an award of $100,000.00 in compensatory damage.

Rather than remand this case for a trial on compensatory damages I would enter a remittitur allowing plaintiff $5,000 in compensatory damages for mental and emotional distress and affirm the balance.

_____
Justice

We concur in the foregoing dissent.

_____

_____

-19-

Mr. Justice Daniel J. Shea, dissenting:

I dissent.

First, this Court should set aside the default judgment entered in this case. It has always been the policy of this Court to favor trial on the merits, and this case is no exception. Second, I agree with Justice Morrison's dissent to the extent that he shows there was no basis in the record for the award of compensatory damages in the amount of $100,000. However, assuming that the default judgment would not be set aside, I would order a new trial on the question of compensatory damages. It is not a good practice for this Court to determine for ourselves what the damages should be. Third, I would set aside the judgment awarding $100,000 punitive damages, and again order that the trial be again held to determine the amount.

The record quoted by Justice Morrison reveals several factors bearing on damages. First counsel for plaintiffs at no time indicated what he considered an appropriate amount to be for compensatory damages. It is also clear that he believed the entire judgment should be "at least fifty thousand dollars" which of course included both compensatory damages and punitive damages. I view an award of damages as based only on passion and prejudice of the trier of fact when the basis of the total judgment of $200,000 ($100,000 compensatory damages and $200,000 punitive damages is that the court believed the defendant should be punished. Although the acts of defendant cannot in any way be condoned, it is clear that the compensatory damages awarded to plaintiffs were awarded because of the outrageous acts of the defendant rather than the actual damages sustained by the plaintiffs.

In addition, the trial court awarded $1,500 attorney fees. Plaintiffs' counsel said he had at least 20 hours on the case and wanted compensation at the rate of $75 per hour. The court, with no

20

further adieu, set the attorneys fees at $1,500. Although defendant has not appealed from the attorneys fees award as a separate ground, nonetheless I find no basis in the law to award an attorney fee in this kind of action.

What has happened to the defendant here does not speak too highly of the fair judicial treatment to which he is entitled, regardless of the outrageous acts he may have perpetrated on the plaintiffs. Justice would best be served by setting aside the default judgment and letting the case proceed on its merits--to a jury if that is the wish of either of the parties.

_Daniel J. Shea_
Justice