No. 87-209

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

DONALD G. BOTTRELL, EDWARD T. REEVE,
and NORTHERN LINE LAYERS, INC.,

        Plaintiffs and Respondents,

  -vs-

AMERICAN BANK, f/k/a WESTERN STATE BANK,
a Montana banking corporation, JIM BEATON
and MARTY DERRIG,

        Defendants and Appellants.


APPEAL FROM: District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone,
               The Honorable William J. Speare, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Anderson, Edwards & Molloy; Donald W. Molloy argued
        for American Bank, Billings, Montana
        L. Randall Bishop argued for American Bank; Jarussi &
        Bishop, Billings, Montana
        Anderson, Brown, Gerbase, Cebull, Fulton, Harmon
        & Ross; Richard Cebull argued for Beaton & Derrig,
        as cross-appellants, Billings, Montana

    For Respondent:

        Herndon, Harper & Munro, Gregory S. Munro argued, Billings
        James Edmiston argued for Northern Line, Billings,
        Montana


Submitted: February 3, 1989

Decided: April 4, 1989

Filed:

_____
               Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Northern Line Layers, Inc. was awarded a judgment of $500,000.00 compensatory damages and $100,000.00 punitive damages against American Bank, based on a jury verdict, in the District Court, Thirteenth Judicial District, Yellowstone County, on January 8, 1987, "together with costs incurred by plaintiffs to be determined."

In the same cause, on the same day, the District Court granted a separate judgment in favor of American Bank against Donald G. Bottrell, in the sum of $22,126.31, and provided that American Bank (Bank) should recover attorneys fees and costs which "shall be determined at a hearing to be set by the court."

In the same cause, on the same day, the District Court granted judgment in favor of American Bank, and against Northern Line Layers, Inc. (NLL), in the sum of $239,629.43, with attorneys fees and costs, which "shall be determined at a hearing to be set by the court."

On January 29, 1987, a further separate judgment was entered by the District Court, based upon its grant of a motion for directed verdict at the close of the plaintiffs' evidence, in favor of the defendants, Jim Beaton and Marty Derrig, and dismissing the "plaintiff's [sic] complaint against" those defendants with prejudice.

Further, during the course of the jury trial, the District Court granted a directed verdict which dismissed the claims of the individual plaintiffs, Don Bottrell and Ed Reeve, for damages against all of the defendants.

American Bank appeals to this Court from the judgment entered against it in favor of NLL. The latter, in turn,

cross-appeals from the judgment entered against it in favor of American Bank. All of the plaintiffs cross-appeal from the judgment dismissing their claims against the individual bank officers, Jim Beaton and Marty Derrig. Donald G. Bottrell and Edward T. Reeve cross-appeal from the judgment dismissing their individual claims against American Bank.

In sorting out this welter of judgments, dismissals, appeals and cross-appeals, we have come to the following conclusions: The judgment for plaintiff of $500,000.00 in compensatory damages is modified to $312,000.00 under the conditions hereafter described. The award of punitive damages of $100,000.00 is affirmed. Such judgments, however, are subject to a setoff in the total amount of $239,629.43. Costs incurred by NLL in the District Court and on this appeal shall be recoverable. American Bank is not entitled to costs or attorneys fees. Judgment interest is recoverable only by NLL, and only on the net amount after application of the setoff as aforesaid. The judgment in favor of American Bank and against Donald G. Bottrell in the sum of $22,126.31 is affirmed. The judgment of dismissal of the claims of Donald G. Bottrell and Edward T. Reeve against American Bank is affirmed. The judgment dismissing the individuals Jim Beaton and Marty Derrig is affirmed.

We recite the facts from the viewpoint of the plaintiffs, since the jury determined in their favor.

> In reviewing a jury verdict, our function is to determine whether the substantial credible evidence in the record supports the jury verdict. We must view the evidence in the light most favorable to the prevailing party below, and if the record presents conflicting evidence which has been resolved by the jury, this Court is precluded from disturbing the verdict. Anaconda Company v. Whittaker (1980), 188 Mont. 66, 610 P.2d 1177. When the evidence is in conflict, we can only

- 3 -

> review testimony for the purpose of determining whether there is any substantial evidence in the record to support the verdict of the jury, and we must accept evidence there found as true, unless the evidence is so inherently impossible or improbable as not to be entitled to belief. Strong v. Williams (1969), 154 Mont. 65, 460 P.2d 90.

Weinberg v. Farmers State Bank (Mont. 1988), 752 P.2d 719, 45 St.Rep. 391.

Donald G. Bottrell and Edward T. Reeve are stockholders and managing operators of NLL, a corporation resident in Billings which specialized in burying telephone lines through contracts with Mountain Bell and other utilities.

The corporation began banking with American Bank on July 31, 1981. Bottrell and Reeve made operating loans from the Bank through its officers Jim Beaton and Marty Derrig. The first loan was for $16,000.00, to be repaid in 30 days upon collection of existing accounts receivable. Small loans were made available throughout 1981 for the purpose of paying operating expenses. In each instance, the Bank was told that repayment was coming from the collection of accounts receivable. In January, 1982, a larger loan was made in the amount of $50,000.00. The Bank memoranda indicated that "this firm will now be doing all of its banking business with us." On February 8, 1982, a $10,000.00 loan was made again to be paid from accounts receivable. In May, a larger loan of $70,000.00 was made for operating capital to be repaid within 60 days. On July 16, 1982, this $70,000.00 loan was extended by an increase and renewal. Loan comments in the Bank records of August 20, 1982 and September 8, 1982 stated the Bank's understanding that NLL's short term loans were being paid from the collection of accounts receivable and noted that the company continued "to perform as agreed." In 1983, there were additional short-term operating loans. Note

No. 14077 was signed on February 15, 1983 for the financing of certain heavy equipment. This note required that the corporation make monthly payments of $3,500.00. As of June 6, 1983, the balance due on note No. 14077 was $71,770.49.

On April 18, 1983 new loan No. 14296 in the amount of $70,008.00 was made for operating capital. This loan was likewise to be repaid from the collection of accounts receivable. On June 6, 1983, however, new loan No. 14463 in the amount of $140,000.00 was taken out for the purpose of paying further operating expenses. At the time this loan was made, part of the proceeds paid off loan No. 14296 in the amount of $70,008.00.

As of June 6, 1983, NLL had six outstanding loans in American Bank, identified as follows:

| Loan Number | Amount | Origination Date |
|---|---|---|
| 8355 | $ 6,006.00 | 9/4/81 |
| 8455 | 4,000.00 | 11/9/81 |
| 8462 | 13,004.00 | 11/9/81 |
| 9470 | 3,000.00 | 1/31/83 |
| 14077 | 71,770.49 | 2/15/83 |
| 14463 | $140,000.00 | 6/6/83 |

In the years subsequent to July 31, 1981, NLL had over 25 loans in American Bank which had never been delinquent nor was any payment missed. Generally, the loans were for purchase of equipment or operating capital. Don Bottrell and Edward T. Reeve procured each of the loans by simply walking in and asking. They waited while the loans were processed, generally for a period of 20 minutes or half an hour, and received the proceeds the same day as requested. They provided whatever information the bankers required with respect to the loans as they were made. There was no requirement that NLL had to borrow exclusively or solely at American Bank.

- 5 -

NLL had other sources of financing. They borrowed money for equipment purchases from Cen-Dak Leasing Company, GMAC Credit Corporation, Case Credit Corporation, and Norwest Bank. In addition, the company borrowed short-term or start-up money from one Lyle Tisor, an officer of Tri-State Equipment Company of Billings, Montana.

Tisor had loaned Don Bottrell money to purchase real estate lots in 1980 and subsequently had made four other loans to NLL for operating capital on a short-term 30 to 90 day basis. NLL borrowed from Tisor for short-term money either for start-up jobs in the spring or to carry NLL over while waiting for checks to come in. The company used Tisor's help to avoid borrowing short-term money under their established line of credit at the Bank. NLL borrowed from Tisor by executing a promissory note and receiving a check from Tisor drawn on his account at Norwest Bank which NLL would then deposit in their main checking account at American Bank. They paid back Tisor with checks drawn on their American Bank account.

NLL borrowed $45,000.00 from Tisor in 1982. The company paid back Tisor with checks drawn on its account at American Bank. One of the checks was for $30,000.00.

In the beginning of the construction season of 1983, NLL borrowed $75,000.00 in short-term funds from Tisor. The company repaid Tisor with two American Bank checks, one for $55,000.00 and the second for $20,718.06. This latter check had the notation "for short-term loan" in the memo section of the check.

The Bank produced daily, for its own use, a "Large Item" report. Nevertheless, Beaton testified that the Bank officers would not be aware if a $55,000.00 check came through the Bank.

On July 11, 1983, NLL borrowed $65,000.00 from Tisor and executed a promissory note therefor. Of those proceeds, $61,000.00 was deposited in NLL's main checking account at the Bank and the other $4,000.00 was put into its two smaller expense accounts at American Bank. Each of the deposit slips had written upon them "Tisor loan." The $61,000.00 deposit was made to the main checking account on July 11, 1983. Before the deposit was made, the account had a balance of $5,300.51. In mid-July, NLL decided to return part of the $65,000.00 to Tisor since all of it was not needed. NLL issued a check for Tisor in the amount of $26,000.00 on July 14, 1983. It is this check that the Bank claims caused it to take its action on July 20, 1983, which is the principal issue of this lawsuit.

On July 18, 1983, Bottrell and Reeve went to the Bank to discuss note No. 14463, for $140,000.00, which originated on June 6, 1983. The note was not due until October 4, 1983. Bottrell and Reeve were concerned that they might have problems repaying the entire note when it came due and wanted to make the bankers aware of their concerns at an early date.

Bottrell and Reeve had personally guaranteed the $140,000.00 note with the Bank. They met with Derrig on July 18, 1983. They discussed work coming up for bid, the company's chances for picking up some of that work and how they were going to handle the note. Beaton was out of town but Derrig said he would set up a meeting with Beaton when he returned. On that day, Derrig offered to loan the company an additional $30,000.00, but Reeve informed Derrig that they did not need the cash at that time, but wanted to discuss the notes due in the fall. Derrig concluded the meeting by stating that he would call NLL when Beaton returned and set up a meeting.

The meeting between the officers of the Bank and Reeve and Bottrell was set for July 20, 1983 at the Bank at 9:15 a.m. On July 19, however, Derrig telephoned Evelyn Hodgdon, a clerical worker at NLL, and informed her that she should gather titles for titled vehicles, serial numbers for non-titled equipment, and descriptions, for submission to the Small Business Administration. Evelyn Hodgdon collected all that information which Derrig told her was necessary and delivered the material to Derrig.

At the meeting of July 20, 1983, at the Bank, Beaton discussed the steps which the Bank would take to address the NLL concerns about the note due in October. He outlined the loans on a blackboard. He indicated that a $12,000.00 indebtedness would be renewed when it came due in September, 1983, and also indicated the Bank would rewrite loan No. 14077 on which there was a principal balance due of $64,323.93 at that time. This was the note on which NLL was paying $3,500.00 a month. Beaton indicated that the Bank would rewrite this note to reduce the interest rate by 1 percent. The bankers indicated that NLL's debt should be placed in long-term rather than short-term financing. As to the $140,000.00 note, Beaton said Derrig would be looking at a Small Business Administration package or some alternative.

There was no discussion in this morning meeting about NLL's performance at the Bank or that it was unsatisfactory in any manner nor was there any discussion about other debts owed by NLL to other entities. At the end of the meeting, the bankers had Bottrell and Reeve sign a completed UCC-1 financing statement listing all of the titles and descriptions which Evelyn Hodgdon had provided the day before. In addition, the bankers had Bottrell and Reeve execute a new note on loan No. 14077 for $65,930.53. The interest rate on their new note was reduced by 1 percent.

Bottrell and Reeve also signed an instrument which contained seven pages of security agreements covering equipment that had been unencumbered on that loan. This instrument was collateral for loan No. 14077, the $65,930.53 note. NLL had not requested this note to be rewritten. The meeting was adjourned and Bottrell and Reeve were told to come back to the Bank at 3:15 p.m. that afternoon.

There was no further contact between the Bank and NLL during July 20, 1983, until Bottrell and Reeve returned at 3:15 p.m., with additional documents and serial numbers that Derrig had requested. At the Bank, they were approached by Derrig who said that Beaton wanted to talk to them.

Bottrell and Reeve went into Beaton's office. Derrig was present. Beaton said, "We have a problem." He told Reeve and Bottrell that the Bank had set off $66,000.00 from NLL's checking and savings accounts against the $140,000.00 loan which was not due until October 4, 1983. The bankers said they felt insecure and that NLL would have to "shore up" its debts. Beaton demanded that NLL either provide additional collateral or pay down the debt before the Bank would release the setoff money.

At the time of the setoff at the Bank, NLL had jobs in progress at Hailey, Idaho, and Sidney, Montana. The Bank froze checks coming to NLL by demanding of Mountain Bell that its name be placed on all checks payable to NLL. Derrig contacted banks in Hailey, Idaho, and Sidney, Montana, and instructed them not to cash any payroll checks of NLL's employees. Employees quit immediately. The payroll checks bounced. Moreover, NLL was unable to pay suppliers to whom it owed legitimate debts and eventually NLL was sued 18 times by suppliers resulting in total judgments of over $46,000.00.

On July 22, 1983, the Bank refused the demand of a lawyer for NLL to release the funds. A lawsuit was commenced soon thereafter.

The Bank further reversed a federal tax deposit which Evelyn Hodgdon had deposited at American Bank on the morning of July 20, 1983 for $3,695.99. This deposit is required of employers who withhold income taxes and social security payments from employees. American Bank was the depository bank acting as trustee for the Internal Revenue Service where deposits for this item were made by NLL. The deposit was made by a check drawn on NLL's main checking account at American Bank. The check was paid by the Bank on July 20, 1983. On July 26, 1983, well after the "midnight deadline," the Bank reversed the check which had paid the federal tax deposit. The amount of the check, $3,695.99 was applied by the Bank to NLL's note No. 14463. Eventually, the Bank reversed this whole procedure when the Internal Revenue Service contacted the Bank.

Reeve and Bottrell had to inject personal cash, and borrow other monies in order to meet payrolls, and complete contracts then existing. They could not bid on other jobs because they had lost their source of financing.

We will refer to other facts where needed further in this Opinion.

I

The first and principal issue raised by the American Bank, is whether, when it exercises a right of setoff existing in the statute and in written agreements with its borrower, it is then subject to tort liability for so doing.

American Bank contended at the trial that the $140,000.00 note of June 6, 1983, was a demand note, and that within the instrument there was language to the effect that the borrower waived demand for payment. The bank officers

- 10 -

testified that because of the language in the note, they could declare the demand note immediately due without notice to the borrower, that the debt then matured, and that the Bank had a right to setoff against the matured indebtedness such deposits of NLL as it had in its possession at the time. No point is made by the Bank on appeal that the instrument is a demand note, but it contends it had the right of setoff by common law, and by statute, as well as under the language of instruments executed along with the note.

NLL answers that the note was not in fact a demand note; that the right of setoff may only apply to matured debts; and that under the terms of the note, the entire amount of the unpaid principal and accrued interest could be declared immediately due and payable, without notice, only upon default of the borrower.

The District Court instructed the jury that the $140,000.00 note was not a demand note. The court also instructed the jury that "when money is deposited in a bank, the bank may apply such funds to the satisfaction of any debt upon which payment is due from the depositor."

A copy of the note is attached to this Opinion for the convenience of the reader.

In summary, we hold that the note in question was not a demand note; that the Bank's right of setoff applies only to a mature debt or one that is due and payable; and that in this case, the Bank could accelerate payment or performance by the borrower under the note only if the borrower was in default, under the terms of the note.

Let us first address the problem of whether the note for $140,000.00 was a demand note.

It will be seen that under the column "due date" are inserted the figures "10-4-83" and that in the body of the note, after the square in which the double x has been

inserted, appears the language, "[i]f no demand is made, Borrower shall pay 120 days after the date of this note." Those terms take this note out of the category of a demand note.

Section 30-3-108, MCA, provides:

<u>Payable on demand</u>. Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated.

Here, the instrument states a time for payment. The legal effect of a note which contains language as here, "upon demand, borrower promises to pay to bank or order . . . If no demand is made, Borrower shall pay 120 days after the date of this note," is that an actual demand is necessary to mature the promissory note prior to the date set. In Peterson v. Valley National Bank of Phoenix (Ariz. 1967), 432 P.2d 446, 451, the Arizona Supreme Court discussed demand notes:

. . . As a general rule, notes payable on demand are due and payable immediately upon execution, and no further demand is necessary to mature them. But an exception to this rule applies when the terms of the instrument disclose an intention by the parties that the notes would not become due and payable immediately after the time of delivery. (Citing authority.) In such circumstances, an actual demand is necessary to mature the promissory notes. The terms of the notes in the present case provided one interest rate for the date of execution until maturity, and a higher interest rate after maturity. This discloses a clear intention by the parties that the notes not be due and payable immediately. To hold otherwise would be inconsistent with the express terms of the note, and render these provisions meaningless.

In the note here before us, 15 percent per annum is the rate of interest if paid when due and 22 percent per annum for amounts paid after the due date.

We turn now to the Bank's right of setoff. By statute, a bank has a general lien, dependent on possession, upon all

property in its hands belonging to a customer, for the balance due to it from such customer in the course of business. Section 71-3-1502, MCA. The right of setoff does not arise simply from the banker's lien however. As pointed out in 10 Am.Jur.2d Banks § 666, funds on general deposit in the bank are the property of the bank, for which the bank is a debtor, and the bank cannot have a lien on its own property. Rather, the right of a bank to set off general deposits is more accurately a right which rests upon and is co-extensive with the common law right to set off mutual demands between mutual debtors and creditors. 10 Am.Jur.2d § 636, supra. In Security State Bank v. First National Bank (1927), 78 Mont. 389, 392, 254 P. 417, 418, this Court said:

> It is well settled that when money is deposited in a bank to the credit of one of its debtors, without an express agreement to the contrary or direction to apply to a specific purpose, the bank may apply the deposit to the satisfaction of a past due indebtedness (citing authority), and this rule applies, although the deposit consists of proceeds from the sale of mortgaged property, if no direction is given as to the disposition to be made of the funds, and the bank has no knowledge of their origin or of another's claim thereto. (Citing authority.) (Emphasis added.)

It will be observed that in Security State Bank, supra, the right of setoff was limited to the satisfaction of "past due indebtedness." It seems generally agreed that the indebtedness must be past due or due and payable in order for the right of setoff to apply. In Crocker-Citizens National Bank v. Control Metals Corp. (8th Cir. 1977), 566 F.2d 631, 637, the Court said:

> . . . However, a bank may only exercise this equitable right of setoff in response to and to the extent of a matured debt owed by a depositor to the bank. See 9 Cal.Jur.3d, Banking, §§ 125, 127.

566 F.2d at 637.

It is undisputed in this case that the Bank applied the setoff of $66,000.00 to the note for $140,000.00 before any demand for payment of the note was made upon NLL. In that situation, the note was not due and payable nor had the indebtedness matured.

The Bank further contended on trial, however, that it applied the deposits as a setoff because it felt itself insecure on the probability that the note might not be paid when due. It claims the right to act in good faith under the provisions of § 30-1-208, MCA:

> Option to accelerate at will. A term providing that one party or his successor in interest may accelerate performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

This statute, however, is of no aid to American Bank. Under the specific terms of this note, the indebtedness may be accelerated by the Bank only "upon default." It is uncontradicted that in this case NLL had always paid their notes on time, had always performed according to their agreements with respect to payments, and that with respect to the $140,000.00 note, no default had occurred. NLL was not in default with respect to any other instrument or agreement with the Bank so as to trigger a default under the terms of the note. Much of the briefs of the parties in this case relate to whether the Bank exercised good faith after deeming itself insecure, but under the terms of the note in question, no acceleration was proper unless NLL was actually in default.

- 14 -

There is another facet, however, to the Bank's claim of right of setoff. The note of June 6, 1983, for $140,000.00 was not secured by collateral nor by a security agreement which specifically applied to that note. American Bank insisted during trial and on appeal that a security agreement executed on February 15, 1983, in connection with a separate note for $71,770.49 was applicable to the $140,000.00 note and gave the Bank a right of setoff.

The security agreement of February 15, 1983, provided that "indebtedness" meant all amounts then or thereafter owed by the borrower to the Bank whether evidenced by a promissory note or not. American Bank contends that the definition of indebtedness, which applies to amounts "hereafter" owed by the borrower to the Bank, makes that security agreement applicable to the $140,000.00 note.

There are at least three reasons why the February 15, 1983 security agreement may not be construed to grant the right of setoff in this case: (1) In any event, the security agreement is limited in its effect to the collateral named in the security agreement. (2) Again, the $140,000.00 note had not matured at the time of the setoff. (3) The security agreement in any event cannot be construed to convert the $140,000.00 note payable at a time certain unless previous demand is made into a past due obligation.

With regard to the February 15, 1983 security agreement, we examine its terms more fully. The collateral listed in the agreement is "all inventory, equipment, and accounts receivable now owned or hereafter acquired." The definition of collateral in the agreement extends the described collateral to accessions, parts or additions thereto, replacements thereof and all proceeds from the sale or disposition of the collateral property. The definition of collateral does not include bank deposits of the borrower,

unless the bank deposits represented proceeds from the sale or disposition of the collateral listed. The security agreement, in stating the rights of the Bank upon default provided that upon default, or if the Bank reasonably deemed itself insecure, it could exercise any one or more of several rights in addition to remedies available at law, in equity or otherwise. All of those rights, however, deal with the resort of the Bank to its collateral, as listed in the security agreement. Under the terms of the agreement of February 15, 1983, therefore, even if the definition of indebtedness covered the $140,000.00 note, and even if the Bank felt itself insecure with respect to the $140,000.00 note, its rights under the security agreement applied only to the collateral listed under the security agreement.

This leads us to the second reason above stated why the security agreement does not grant a right of setoff for the reason that the $140,000.00 indebtedness had not matured. The security agreement provided that the rights of the Bank were cumulative and that the Bank could exercise any other rights or remedies of a secured creditor under the Uniform Commercial Code, at law, in equity or otherwise. Thus, the security agreement did not increase in any way the rights of the Bank beyond what the law already provided. It is clear that the right of setoff does not accrue unless the debt to the Bank had matured.

The basis of the right of setoff must be clearly understood because it applies not only to the relations between a bank and its depositors, but to any relationship where two parties are mutually debtor and creditor to each other. When a bank accepts an unrestricted deposit of money, title to the money passes to the bank and the relationship between the bank and the depositor is that of debtor-creditor. If the depositor at the same time owes a

debt to the bank which is due, the right of setoff arises, under the common law and under the law merchant, because of the mutuality of the debts. Both the bank and the depositor are mutually debtors and creditors toward each other. Such mutuality must exist for the right of setoff to apply. This was explained in Spratt v. Security Bank of Buffalo, Wyo. (Wyo. 1982), 654 P.2d 130, 135-136:

> We next reach appellant's claim that the bank's set-off should fail for lack of mutuality between appellee and Gail Fanning. Before going further, we need to discuss a bank's right to setoff against the general deposits in its possession. The bank's right of set-off to secure the payment of its depositor's indebtedness is a part of the law merchant and well established in commercial transactions. (Citing authority.) For a bank to establish a right to be setoff, three conditions must be met: "the fund to be set-off must be the property of the debtor, the fund must be deposited without restrictions, and the existing indebtedness must be due and owing." (Citing authority.) The bank's right to setoff does not arise until the time the depositor's indebtedness to the bank has matured. (Citing authority.) Addressing appellant's point, for a set-off to be permissible, there must be mutuality of obligation between the debtor and his creditor, as well as between the debt and the fund on deposit. (Citing authority.) Debts to be used as set-offs must be due to and from the same persons in the same capacity. (Citing authority.)

Under the evidence in this case, at no point did the Bank make demand for the full payment of the $140,000.00 note, before the setoff or afterward. At the afternoon meeting of July 20, 1983, the demand of the Bank was not for full payment of the $140,000.00 note, but for additional collateral, or to "shore up" the collateral.

The third reason stated above why the security agreement does not aid the Bank in this case is that the security agreement cannot amend the terms of the later note. The

- 17 -

language in the security agreement, that the Bank, if it reasonably deemed "itself insecure" could exercise its rights under the security agreement may not be utilized to vary the terms of the note of the $140,000.00 note itself. It is on its face a promissory note payable at a time certain, unless a previous demand is made, and under the language of the note the Bank had no power to declare the entire unpaid principal and accrued interest believed due and payable without notice except "upon default." No default existed with respect to any of the notes due and payable to the Bank when it attempted its "setoff."

## II

The next issue raised by American Bank is that it should not have been subjected to tort liability for doing that which is permitted by law.

As the foregoing discussion indicates, the premise of the issue is without basis, since the setoff in this case is not permitted by law. In any event, we now pass on to determine whether the issue of a breach of the implied covenant of good faith and fair dealing existed here.

In Nicholson v. United Pacific Insurance Company (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822, we set forth:

> The Montana cases discussed above focus on the action of the breaching party in the relationship to find a breach of the implied covenant, not just the existence of a breach of contract.
>
> . . . But whether performing or breaching, each party has a justifiable expectation that the other will act as a reasonable person. Neal v. Farmers Ins. Exchange (Cal. 1978), 582 P.2d 980. The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for

damages    resulting    from    the    other's    culpable
conduct.

710 P.2d at 1348.

American Bank makes no objection to the instructions given by the court to the jury in this case. The District Court adopted the theory that the promissory note and the security agreements allowed the Bank to declare the $140,000.00 note immediately due and payable without notice and that it had a right to setoff if the Bank reasonably believed it was insecure. The District Court obviously was relying upon the provisions of § 30-1-208, MCA, supra.

The other instructions to the jury fairly presented the implied covenant of good faith issue. The court instructed that the apparent danger to the prospect of payment or performance by NLL or the existence of good reason to believe such danger existed was sufficient to show that the Bank acted reasonably and in good faith; and that the nature and extent of an implied covenant of good faith and fair dealing was measured in a particular contract by the justifiable expectations of the parties; that the obligation of good faith and fair dealing was mutual so that if the defendant breached the implied covenant, the jury must also determine whether the plaintiff had breached the implied covenant of good faith in dealing with the Bank.

In First National Bank In Libby v. Twombly (1984), 213 Mont. 66, 689 P.2d 1226, the bank accelerated the payment due on a promissory note without notice to the borrower and set off $2,865.00 in Twombly's checking account against the indebtedness. The issue of good faith for the set off was submitted to the jury under § 30-1-208, MCA, as to whether the bank in good faith believed that the prospect of payment or performance by the borrower was impaired. This Court approved the decision of the jury that the obligation of good

faith was breached and remanded the case for determination of the jury question whether the borrower was entitled to punitive damages.

In Noonan v. First Bank Butte (Mont. 1987), 740 P.2d 631, 635, 44 St.Rep. 1124, we said (referring to McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 43 St.Rep. 206):

> We held in McGregor that breach of the UCC standard of honesty in fact is not enough to constitute a tort. The minimal requirement for the tortious breach of the covenant of good faith and fair dealing is action by the defendant which was arbitrary, capricious or unreasonable, and exceeded plaintiffs' justifiable expectation. McGregor, 714 P.2d at 543. The instruction given in this case inadequately defined the tort. We hold, as in McGregor, that the giving of this instruction is reversible error.

Here the court adequately instructed the jury on the implied covenant of good faith based on Noonan and McGregor, and on a theory of liability more favorable to the Bank than the law applying to setoff would allow. The jury found on the facts according to the instructions.

### III

The jury also found that the Bank in this case was guilty of negligent misrepresentation to its borrower. American Bank contends that there is no substantial evidence to support the charge of negligent misrepresentation.

On this subject, the District Court instructed the jury as follows:

> Plaintiff claims that defendant negligently misrepresented certain facts. In order to establish this claim, plaintiff has the burden of proving:
>
> (1) that defendant supplied false information for the guidance of plaintiff in his business transaction;

(2) that plaintiff justifiably relied upon such information; and

(3) that defendant failed to exercise reasonable care or competence in obtaining or communicating such information.

Reasonable care is that degree of care which a reasonable and prudent person in the position of defendant would ordinarily exercise in the circumstances.

Plaintiff is not entitled to damages for any representation by defendant, however, unless it was the cause of damage to plaintiff.

That instruction is drawn from our decision in Brown v. Merrill Lynch, Pierce, Fenner, Etc. (1982), 197 Mont. 1, 12, 640 P.2d 453, 458. The instruction is based on the Restatement (Second) of Torts § 552 (1977) as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by the justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Relying on language of Falls Sand and Gravel Co. v. Western Concrete, Inc. (D. Mont. 1967), 270 F.Supp. 495, 502; and in Bushnell v. Cook (Mont. 1986), 718 P.2d 665, 668, 43 St.Rep. 825, 828, American Bank contends that in Montana an action for negligent misrepresentation is in fact an action for fraud. In this case, after the court decided that it would instruct the jury as above set forth, plaintiffs withdrew their instructions relating to constructive fraud. The jury found, in answer to a special interrogatory, that American Bank was not guilty of actual fraud. American Bank therefore contends that absent either constructive fraud or

actual fraud, an action for negligent misrepresentation does not lie.

This misconception arises from some apparent conflict in our statements in other cases. In Brown, supra, this Court correctly said that "[a] tort action in fraud may either be based on an intentional, fraudulent and deceitful misrepresentation or it may be based on a negligent misrepresentation." 640 P.2d at 458. In the federal case of Falls Sand and Gravel Co., supra, the District Court concluded that an action for negligent misrepresentation would be recognized in Montana as an action for fraud. 207 F.Supp. at 502. In Bushnell v. Cook, supra, where the court did not instruct on negligent misrepresentation, but did instruct on constructive fraud, this author stated that in Montana an action for negligent misrepresentation is an action for fraud and so the jury was adequately instructed. 718 P.2d at 668.

By statute, constructive fraud consists of: (1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person at fault by misleading another to his prejudice; or, (2) any act or omission as the law especially declares to be fraudulent, without respect to actual fraud. Section 28-2-406, MCA. Thus, a negligent misrepresentation may constitute a breach of duty, without an actual fraudulent intent, if it gains an advantage to the person at fault by misleading another to his prejudice. Generally, an act or omission of a fiduciary or one in confidential relationship is necessary to constitute constructive fraud. Yet, in Roil Energy Corporation v. Drilcon, Inc. (Mont. 1988), 749 P.2d 1048, 45 St.Rep. 114, this Court held that a fiduciary relationship was not needed for a finding of constructive fraud under the special circumstances of that case. Thus, a negligent

representation, depending on the circumstances, can give rise to a case of constructive fraud under § 28-2-406. Yet, under Restatement (Second) of Torts § 552, supra, a negligent misrepresentation may be insufficient to constitute actual fraud or constructive fraud, but nevertheless give rise to negligence liability under § 27-1-701, MCA, through the want of ordinary care of the defendant in managing his property or person. In the latter case, the test of liability is the exercise of reasonable care and is subject to comparative negligence.

The late Justice Cardozo explained the basis of liability by posing the example: Think of the fields of liability for constructive fraud and for misrepresentation as concentric circles with a common center and differing radii, where the liability in each theory is based on misrepresented facts. The breach of a legal duty will create liability in constructive fraud; but a negligent misrepresentation may create liability even without a constructive fraud; the first, because the liability is imposed by law, whereas the liability for a negligent breach is based on lack of ordinary care and comparative negligence may be considered. See Ultramares Corp. v. Touche (N.Y. 1931), 174 N.E. 441. Negligent misrepresentation is co-extensive with constructive fraud, based on the same misrepresentation, where there is a breach of legal duty; if there is no breach of legal duty, but the misrepresentation is negligence under Restatement (Second) of Torts § 552, negligence is the basis of the liability.

In this case, therefore, the District Court acted properly in instructing the jury on negligent misrepresentation, according to Brown v. Merrill Lynch, supra. It was not necessary that the negligent

- 23 -

misrepresentation constitute constructive fraud, nor actual fraud.

There is sufficient evidence to support the jury finding of negligent misrepresentation by American Bank. Its officers represented that it would assist NLL in obtaining long-term financing for the $140,000.00 indebtedness in the form of an SBA loan. At the same time, the Bank took steps to procure from NLL additional security interests on its other loans while promising to assist NLL to obtain a SBA loan. It then accomplished the setoff without any notice to NLL. NLL relied upon the Bank's representation of assistance, and provided all of its inventory and equipment and accounts receivable as security for the other loans, which had the result of preventing NLL from seeking an alternate source of financing. A jury determined that the actions of the Bank were not actually fraudulent, but constituted negligent misrepresentation.

IV

American Bank attacks both the compensatory and punitive damage awards on the ground that the evidence was insufficient.

American Bank's attack on the compensatory damages is that they were speculative and without foundation, relying on Agrilease, Inc. v. Gray (1977), 173 Mont. 151, 566 P.2d 1114; and Walton v. City of Bozeman (1978), 179 Mont. 351, 588 P.2d 518; as well as Stensvad v. Miners & Merchants Bank (1982), 196 Mont. 193, 640 P.2d 1303, cert. denied, 459 U.S. 831. American Bank's attack is based on its contention that there was no evidence of lost profits. NLL did not rely completely upon lost profits.

As a result of American Bank's exercise of setoff, NLL was left without any operating cash or a line of credit. It lost all of its employees, being unable even to pay its

accountant to produce annual financial statements. As a result, the company was sued many times, resulting in judgments against NLL totaling $46,000.00. NLL had a net worth, if the company assets were sold at auction, of $194,429.00 at the time of the setoff. If the company assets were sold piece by piece, its value would increase by $117,000.00, to approximately $312,000.00. The goodwill of the company as an existing business was destroyed and the company, in order to exist, had to enter into joint venture agreements with general contractors, wherein they shared any profit, and the general contractor paid wages and salaries necessary. Testimony indicated that NLL's business and credit reputation were damaged substantially. NLL had been grossing over $1 million in gross income a year until the set off.

Tort damages are allowable whether the damages "could have been anticipated" or not. Section 27-1-317, MCA. When the fact of damages is established in the evidence, reliance is given to the trier of fact to determine the amount of the damages. Crystal Springs Trout Co. v. First State Bank (Mont. 1987), 732 P.2d 819, 44 St.Rep. 90. In Laas v. Montana Highway Commission (1971), 157 Mont. 130, 483 P.2d 699, damages were allowed for lost profits even though the plaintiff could not prove with certainty which contracts he would have received and what amounts. When there is strong evidence of the fact of damage, a defendant is not allowed to escape liability because the amount of damages cannot be proved with precision. Jarussi v. Board of Trustees of School District No. 28 (1983), 204 Mont. 131, 664 P.2d 316; Johnson v. Murray (1982), 201 Mont. 495, 656 P.2d 170.

This Court, however, finds considerable difficulty with respect to the compensatory damages. It is fairly certain from the evidence that after the Bank acted to cut off NLL

from any further financing, the company was then forced to look to other sources in order to stay in business. The company undertook to perform construction jobs for Bonneville Construction Company of Las Vegas, Nevada, under an arrangement where Bonneville would pay NLL's payroll, provide its payroll taxes, liability insurance, and money for its operating expenses. Thereafter, Bonneville computed the profit on the jobs performed by NLL, withheld a "retainage" and divided the profit from the jobs with NLL. Although it appears from the testimony of the president of Bonneville that NLL had received disbursements of $150,000.00 on one job, and the president was unable to state the amount of gross payment on another job, the record is incomplete as to the exact amount of profits lost by NLL because it was forced to undertake jobs financed by Bonneville. In like manner, NLL entered into joint ventures with Clyde and Dale Morris whereby the Morrises provided the financing, Dale worked for NLL and the profits on any job were split between them. Again, however, the record is bare of the amount of profits lost by NLL under this arrangement. We are faced with the situation where, although there is strong evidence of the fact of damage, in order to establish the amount of lost profits reasonable to be ascribed as damages, the court would have to resort to speculation. The positive figure that we can extract from the record is that the value of the company was lost by reason of the cutoff of its financing, and the figure most favorable to the plaintiffs is $312,000.00.

Under the circumstances, based upon the record, it is necessary for us to require that the compensatory damages be reduced to the sum of $312,000.00. As so modified, the compensatory damages are affirmed, subject to the condition of remittitur hereafter set forth.

With respect to punitive damages, the jury awarded $50,000.00 for breach of the implied covenant of good faith and fair dealing, and $50,000.00 for the negligent misrepresentation.

There is no complaint here that the jury was not properly instructed either on the subject of compensatory damages or punitive damages. Punitive damages are especially within the province of the jury. Weinberg v. Farmers State Bank of Worden (Mont. 1988), 752 P.2d 719, 45 St.Rep. 391 states:

> . . . The jury was likewise instructed as to what it must find with respect to punitive damages. The Bank does not contend that those instructions were inadequate and indeed they seem to contain the necessary elements to properly instruct the jury on this item. The jury having been properly instructed, once again, we are left to the familiar appellate rules which are recited above respecting the sufficiency of the evidence. The jury found a breach of an implied covenant, and it found that the breach was oppressive, malicious and arbitrary. Once having made that determination, the jury determines the amount of damages.

The actions of the Bank following the setoff are a sufficient basis to sustain punitive damages. The payroll checks of NLL were stopped when the Bank officer contacted banks in Hailey, Idaho, and Sidney, Montana, instructing them that payroll checks would not be honored at American Bank. The Bank attempted to get its name placed on any checks for payments coming to NLL from Mountain Bell. It improperly reversed the federal tax deposit which represented the income taxes and Social Security withheld from the incomes of the employees. Reeve and Bottrell were forced to inject personal cash, and borrow other monies in order to meet the payrolls and complete the contracts then existing. The effect of the setoff was to stop payment on the Tisor check in the sum of

$26,000.00, which, but for the setoff, would properly have been paid by the Bank. The punitive damages are affirmed.

V

NLL and Donald G. Bottrell and Edward T. Reeve, as individuals, cross-appealed from the dismissal by the District Court of Jim Beaton and Marty Derrig, the Bank officers in this case. In their cross-appeal, the plaintiffs contend that the wrongful acts of the Bank in connection with the setoff and subsequent actions were those of Beaton and Derrig, the officers of the Bank, and as such they incurred a personal liability for their torts, in addition to or concurrent with the liability of American Bank. They rely on Little v. Grizzly Manufacturing (1981), 195 Mont. 419, 636 P.2d 839; Crystal Springs Trout Co. v. First State Bank (Mont. 1987), 732 P.2d 819, 44 St.Rep. 90; and Poulson v. Treasure State Industries (1981), ___ Mont. ____, 626 P.2d 822.

The officers, Beaton and Derrig rely on our holding in Phillips v. Montana Education Association (1980), 187 Mont. 419, 610 P.2d 154.

On the evidence of this case, we determine that the actions of officers Beaton and Derrig were not on behalf of themselves as individuals or for their own pecuniary benefit, nor were their actions against the best interests of the corporation for which they were employed. They acted within the scope of their employment, and in furtherance of corporate interest. As such, they are entitled to the protection of the corporate shield from personal liability.

> Where an officer or director acts against the best interests of the corporation, acts for his own pecuniary benefit, or with the intent to harm the plaintiff, he is personally liable. (Citations omitted.)

- 28 -

Phillips, 187 Mont. at 425, 610 P.2d at 158.

The tests prescribed in Phillips are not met here and, accordingly, we affirm the dismissal of the plaintiffs' action against the officers of the Bank individually.

VI

NLL cross-appeals from the judgment entered against it in favor of American Bank in the sum of $239,629.43. It is not clear from the cross-appeal whether Donald G. Bottrell is also appealing from the separate judgment against him in the sum of $22,126.31 in favor of American Bank. Since, however, the same principles apply to each of those judgments, we will discuss them together.

The basis of the cross-appeal is that the actions of American Bank in this cause made it impossible for NLL and Donald G. Bottrell to pay the Bank the amounts due on promissory notes executed by NLL, and separately by Donald G. Bottrell.

The cross-appellants rely on § 28-1-1302, MCA, to the effect that if the performance of an obligation is prevented by the creditor, the debtor is entitled to all the benefits which he would have obtained if it had been performed by both parties. The District Court entered a directed verdict in favor of the Bank on the unpaid notes, holding that § 28-1-1302, did not apply.

The position of the cross-appellants here is that the promise of NLL and Donald G. Bottrell to make payment on the notes was dependent upon the Bank's continuing good faith to follow the terms of the notes and not improperly to accelerate the payments or set off the bank accounts of NLL, thereby making it impossible for both NLL and Bottrell to perform. Under § 28-1-1301(1), MCA, performance is excused by one party when it is prevented or delayed by the act of

the creditor. They cite Western National Bank of Lovell v. Moncur (Wyo. 1981), 624 P.2d 765.

We determine that inability to pay promissory notes, even though argument could be made that the inability is caused by the obligees' actions, is not in itself a sufficient defense here to the promissory notes. The District Court determined that inability to pay is the common problem of any maker of a promissory note who defaults and such inability to pay is not in itself a sufficient defense to the obligations due on the promissory note. We agree.

The cross-appeal against the judgment in favor of American Bank in the sum of $239,629.43 is denied, and the amount affirmed. The same rule would apply to the judgment of $22,126.31 against Donald G. Bottrell.

## VII

Donald G. Bottrell and Edward Reeve cross-appeal from the District Court's grant of a directed verdict to dismiss their individual claims against American Bank. Bottrell and Reeve were officers and shareholders of NLL. The question involved is whether they may individually recover for their damages, including claims of emotional distress. Their claims are based upon the fact that they were required to sign personal guarantees of the corporate indebtedness, and for that reason, are subject to the same judgment as has been assessed against NLL, for the corporate notes issued to American Bank.

This issue is controlled by our holding in Moats Trucking Co., Inc. v. Gallatin Dairies, Inc. (Mont. 1988), 753 P.2d 883, 45 St.Rep. 772. In that case, we said:

> In Malcolm v. Stondall Land Co. (1955), 129 Mont.
> 142, 145, 284 P.2d 258, 260, this Court stated the
> general rule regarding a stockholder's personal
> right to sue in the corporation's cause of action:

". . . As a general rule stockholders may not sue upon a cause of action belonging to their corporation whether they are in their own names or in the name of the corporation itself."

In Malcolm, this Court addressed for the first time the issue of whether individual shareholders who control all the stock of the corporation may disregard the corporate entity and sue as individuals on the corporation's cause of action. We held that such individual shareholders do not have the right to pursue an action on their own behalf when the cause of action accrues to the corporation. Malcolm, 129 Mont. at 146, 284 P.2d at 260.

Here the cause of action rightfully belongs to the corporation and not to its shareholders. Accordingly, we affirm the dismissal of the individual claims of Bottrell and Reeve against American Bank.

## VIII

Having determined all of the issues in this cause, we now turn our attention to the forms of judgment that were entered in the case and the resulting difficulties that have ensued.

As we noted, the District Court ordered a judgment in favor of NLL and against American Bank, in the sum of $500,000.00 compensatory damages and $100,000.00 punitive damages, based on a jury verdict. In a separate judgment, based on the corporate notes, the District Court granted judgment in favor of American Bank and against NLL in the sum of $239,629.43. In that case, the court delayed the determination of attorneys fees and costs for a later hearing to be set by the court.

When these matters came to us on appeal, the District Court file included an order of the District Court staying execution on the judgment against American Bank because it had filed a supersedeas bond in the sum of $600,000.00.

In the District Court, NLL also moved the court for a stay of proceedings of the judgment against it on the notes, asking that it be excused from posting a supersedeas bond. The District Court denied that motion. NLL then came to this Court, asking us to reverse the District Court's order regarding the supersedeas bond and for a stay of execution. On July 28, 1987, we denied plaintiffs' motion and eventually NLL filed a supersedeas bond.

We determine that the grant of two separate judgments arising out of the same general issue was an improper procedure in this case.

A proper procedure is described as Stensvad v. Miners and Merchants Bank of Roundup (1982), 196 Mont. 193, 640 P.2d 1303. There, we said:

> Appeal is by Miners and Merchants Bank from a judgment rendered against it on Stensvad's complaint to the District Court, Fourteenth Judicial District, Musselshell County. The bank had counterclaimed against Stensvad on unpaid promissory notes.
>
> The District Court found that the bank had breached an agreement to finance Stensvad's corporations and after that breach had converted or appropriated his property, resulting in damages to Stensvad of $1,631,047, plus lost profits in the sum of $511,695. The court granted a set-off of $1,750,234, as of January 31, 1979, by reason of the indebtedness of the plaintiff to the bank. The court's net judgment of $392,508 against the bank was subsequently reduced nunc pro tunc by deducting $117,904 on June 23, 1980. The resulting judgment against the bank is $274,604.

The same situation as occurred in Stensvad should have occurred here. NLL brought an action against the Bank alleging several torts. The Bank counterclaimed for notes due and owing from NLL against the Bank. In that situation, but one judgment should result.

> Where a setoff or counterclaim is pleaded, it becomes a part of a single controversy between the parties, requiring only one verdict and one judgment according to the facts. The general rule is that where an established setoff for counterclaim is less than plaintiff's demand, plaintiff has judgment for the residue only; if it equals plaintiff's claim, the judgment must be for defendant; in case it exceeds what is claimed and established by a plaintiff, defendant has judgment for the excess. But where a setoff or counterclaim is used defensively only, a judgment cannot be recovered against plaintiff for any excess over plaintiff's claim.

20 Am.Jur.2d Counterclaim, Recoupment, Etc. § 157.

In Travelers Express, Inc. v. Acosta (Fl.App.3d 1981), 397 So.2d 733, it was held that if the main claim and a counterclaim are tried separately, the disposition of the claim which is earlier decided of the two remains interlocutory until the final disposition of the other claim. The final disposition of both the main claim and the counterclaim should be entered in a single judgment. In the case at bar, where directed verdict was granted in favor of the Bank on its notes, that action of the District Court was interlocutory, and should not have been entered in a separate judgment until a final disposition of both the main claim and the counterclaim in a single judgment.

We recognized that rule in E.C.A. Environmental Management v. Toenyes (1984), 208 Mont. 336, 345, 679 P.2d 213, 217-18, where we said:

> No one factor should be considered in determining the prevailing party for the purpose of attorney fees. The party that is awarded a money judgment in a lawsuit is not necessarily the successful or prevailing party. However, this Court agrees with those jurisdictions that have found the award of money to be an important item to consider when deciding who, in fact, did prevail. (Citing authority.) Here, MMI brought suit to recover sums due it on a note usurious on its face. The usury

- 33 -

penalty assessed MMI resulted not only in a denial of recovery, but an adverse award. The net judgment was in favor of defendants. The party that survives an action involving a counterclaim, setoff, refund or penalty, with a net judgment should be generally considered the successful or prevailing party. (Citing authority.) On the facts presented and viewing the action on the note in its entirety, the defendants were properly found to be the prevailing party.

It was pointed out in E.C.A. Environmental Management, supra, 679 P.2d at 217, that the provisions of § 28-3-704, MCA, make the contractual right to attorney fees reciprocal. There it is provided that in the event that the party having a contractual right to attorneys fees brings an action upon the contract or obligation, the other parties are deemed to have the same right for attorneys fees and "the prevailing party in any such action, whether by virtue of the express contractual right or by virtue of this section shall be entitled to recover attorneys fees from the losing party or parties."

In First National Bank of Libby v. Twombly, supra, 689 P.2d at 1230, we reversed an award of attorney fees because the bank was not the prevailing party. In that case, the jury had awarded compensatory damages in an amount in excess of the bank's claim for the balance due on the note, and accrued interest. That same situation obtains here.

Accordingly, we order that the judgment for compensatory damages in favor of NLL and against American Bank be modified to the sum of $312,000.00. NLL is given 30 days from the date of this judgment in which to file in the District Court its written acceptance of the compensatory judgment as so modified. If the modification is not so accepted, the award of compensatory damages shall be deemed reversed for a new trial on the issue of compensatory damages. For the purpose

of this remittitur, the time provisions of Rule 34, M.R.App.P., (Petitions For Rehearing) are postponed for 30 days as to any party.

We further direct on remand that the Bank's judgment be set off against the plaintiffs' judgment for compensatory and punitive damages and the net amount be entered as the final judgment in this case. No award of attorneys fees shall be granted to either party but NLL shall recover its other costs. Interest shall be awarded only on the net judgment, since if judgment were properly entered in this case, the Bank's judgment would have been satisfied through set off against the judgment of NLL. Otherwise, we affirm the separate judgment in favor of American Bank against Donald G. Bottrell in the sum of $22,126.31. We further affirm the judgments dismissing from this cause the individual defendants, Jim Beaton and Marty Derrig, and the individual plaintiffs, Donald G. Bottrell and Edward Reeve.

_____
Justice

We Concur:


_____
Chief Justice


_____

_____
Justices

- 35 -

# COMMERCIAL NOTE
## Single Advance



**(simple interest)**

FOR BANK USE ONLY

| Account Number | Loan Number | Disbursement Date | Due Date | Principal Amount | Call Code | Collateral Code | Officer Number | Officer's Initials |
|---|---|---|---|---|---|---|---|---|
|  | 14463 | 6-6-83 | 10-4-83 | 140,000.00 | H |  |  | MD |

Borrower: **Northern Line Layers, Inc.**          Bank: **Western State Bank**

P.O. Box 30643                          P.O. Box 50400

Billings, MT 59107                      Billings, MT 59105

Upon demand, Borrower promises to pay to Bank, or order,
One hundred forty thousand and no/100------------------------------------------------- DOLLARS
($ 140,000.00 ), together with interest on the unpaid principal balance outstanding from time to time at the rate set out below. Interest will accrue on the outstanding unpaid principal balance for each day that any amount is outstanding and will continue to accrue until this note is paid in full. Interest will be at the rate of:

☒ __15__ percent per annum.

☐ A rate of _____ point(s) over the prime rate, adjusted _____ , based upon the prime rate quoted by _____ .
That prime rate currently is _____ percent per annum, and the rate on this note currently is _____ percent per annum.

☐ _____

Borrower will pay interest:   ☐ Monthly   ☐ Quarterly   ☒ At Maturity   ☐ _____

☒ If no demand is made, Borrower shall pay **120** days after the date of this note.

☐ If no demand is made, Borrower will pay under the following schedule: _____

The interest rate shall not exceed the maximum rate permitted by applicable law. If Borrower does not pay as agreed, or if Borrower or any guarantor of this note breaches any other agreement with the Bank, Borrower will be in default. Upon default, the Bank may declare the entire unpaid principal and accrued interest immediately due, without notice, and Borrower will then pay that amount. Upon default Bank also may increase the interest rate _____ points, and include any unpaid interest as of the date of acceleration or maturity as part of the sum due and subject to the higher rate.

Any payment not paid when due shall bear interest at the rate of ___22___ percent per annum until paid. Borrower will pay Bank at the address named above, or such other place as Bank may designate in writing.

The Bank may pay someone else to help collect this note if Borrower does not pay. Borrower also will pay the Bank that amount. This includes the Bank's lawyers' fees whether or not there is a lawsuit, including any fees on appeal. Borrower also will pay any court costs. The Bank may delay enforcing any of its rights under this note without losing them. If there is a lawsuit, Borrower agrees venue may be in the county in which Bank is located.

Borrower waives presentment, demand for payment, protest, notice of dishonor, and notice of every other kind. The obligations of the Borrower are joint and several.

Date: **June 6, 1983**

**Northern Line Layers, Inc.**

By ___Edward R elle___

By _____

© 1981 CFI Management Services, Inc.

Mr. Justice Fred J. Weber dissents as follows:

I dissent because I conclude there was insufficient evidence to sustain the compensatory damage award. I also conclude that the Bank properly exercised its right of set-off.

A brief review of facts during the months of May, June and July, 1983 will help to demonstrate the financial problems on the part of NLL. Bank officers testified that it was their understanding that NLL was doing all of its business with the Bank. The Bank had no knowledge of the borrowings from Mr. Tisor. The evidence established that NLL borrowed $75,000 from Mr. Tisor in May and another $65,000 on July 11, 1983. On June 6, 1983, the Bank loaned NLL $140,000 as evidenced by the note discussed in the majority opinion. On June 7, NLL used $55,000 of that loan to pay to Mr. Tisor. Bank officer Reeve testified that the Bank would not have made the loan had it known that it would have been used to repay a debt. The understanding on the part of the Bank was that the $140,000 was to be used for the year's operating expenses.

On July 18, 1983, Mr. Reeve and Mr. Bottrell of NLL came into the Bank to disclose their serious financial problems. The $140,000 note was due in October 1983. NLL was concerned that they would not be able to pay that note when it came due. NLL was having significant problems in maintaining its business at a level comparable to earlier years. Bank president Beaton testified that the July 18 disclosures by Mr. Bottrell and Mr. Reeve caused a great deal of concern. His basic question was, what happened to the $140,000 which had been loaned to NLL? This sum had been expected to finance NLL through 1983. Mr. Beaton's concern turned to alarm on

37

July 20 when while reviewing the checks going through NLL he discovered a check to Mr. Tisor in the amount of $26,000, with a notation on the check that it was for a loan payment. It became apparent that NLL was borrowing from an unknown third party. This created a crisis which demanded immediate action on the part of Mr. Beaton as he had to either pay the Tisor check or refuse payment. The Bank could choose to allow a preferential payment to another creditor or to apply the money to its own indebtedness. At that point Mr. Beaton concluded that the Bank was insecure and exercised its right to a set-off. In the next two days NLL did not provide any satisfactory financial statements. In addition NLL did not give any explanation of the Tisor loans.

The evidence submitted at trial demonstrates that on July 20, 1983, NLL indeed was in serious financial straits. While the gross revenue figures for NLL showed the following: 1981 - $599,000, 1982 - $538,000, and 1983 - $1,288,000, the net income was limited to the following: 1981 - $7500, 1982 - $6475, and 1983 - a loss of over $18,000. Originally NLL had reported to the Bank a 1982 net income of $24,500. Although this figure was corrected to the $6475, the Bank was not given the corrected information. In addition, the company's own CPA and Mr. Howard, an accounting professor who analyzed NLL's financial situation, testified that on July 20, 1983, NLL's asset to liability ratio indicated insolvency.

The record contains substantial evidence demonstrating that NLL had significant problems in 1983 arising from its inability to obtain additional contracts, and that the likelihood of making money from which the debts could be repaid was clearly questionable. The overall picture reveals a company with serious financial problems which was attempting

38

to maintain an appearance of "performing as agreed." Such picture also reveals that from the Bank's viewpoint, NLL was "borrowing from Peter (Bank) to pay Paul (Tisor)."

With this background information, let us now consider the compensatory damages award. The majority concluded that there was insufficient evidence to justify the judgment of $500,000 and reduced the same to $312,000. As I review the evidence, I conclude that the $312,000 award still clearly is speculative. Even if we assume that the Bank caused injury to NLL, NLL still failed to prove actual damages which resulted from the Bank's conduct. NLL did not even attempt to prove its lost profits. While it argued that its net worth had been reduced, it failed to prove the amount of such reduction in value. The record does not contain a basis to justify $312,000 of compensatory damages.

The compensatory damage verdict was not broken down into its component parts so we do not know the elements which the jury included in that award. It appears that the basis for compensatory damages would be a reduction in the net value of the company, or the loss of profits. While there was testimony indicating that a liquidation value might be $312,000, no specific evidence was presented to demonstrate the extent of the reduction in net value as a result of the Bank's action.

Damages may only be awarded for lost profits if NLL proved that there were lost profits and that such lost profits resulted from the Bank's action. The amount of lost profits must be established to a reasonable certainty using the best evidence available under the circumstances.

In Stensvad v. Miners & Merchants Bank, Etc. (1982), 196 Mont. 193, 640 P.2d 1303, we stated:

39

Damages for loss of profits may be awarded if not speculative. Silfvast v. Asplund (1935), 99 Mont. 152, 161, 42 P.2d 452, 456. The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Tri-Tron Intern. v. Velto (9th Cir. 1975), 525 F.2d 432, 437. Once liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court. Smith v. Zepp (1977), 173 Mont. 358, 370, 567 P.2d 923, 930. But no damages are recoverable which are not clearly ascertainable both in nature and origin, and only profits which are reasonably certain may be awarded. Smith v. Fergus County (1934), 98 Mont. 377, 386, 39 P.2d 193, 195. (Emphasis supplied.)

While precision is not required in calculating damages, the evidence must be sufficient to afford a reasonable basis for determining the specific amount awarded. Cremer v. Cremer Rodeo Land and Livestock Co. (1981), 181 Mont. 87, 627 P.2d 1199. In Cremer the lost profit award was sustained because specific evidence was presented. However, in Stensvad the award of lost profits was speculative since no profit record prior to the breach of contract was presented. This Court has recently vacated damage awards as having no foundation in the record. See Bolz v. Myers (1982), 200 Mont. 286, 651 P.2d 606. In Lenz Const. Co. v. Cameron (1984), 207 Mont. 506, 674 P.2d 1101, this Court affirmed the district court's denial of unproven damages.

Initially, NLL must show that it was in fact damaged by the Bank's actions. There was testimony indicating that NLL lost its competitive edge, and was unable to bid on certain Idaho projects as a result of losing its source of financing.

NLL did establish that it was required to share profits under a joint venture-subcontract arrangement with Bonneville. While there is proof of the sharing of profits, there is no demonstration that this resulted in actual financial loss to NLL. Obviously the contract had been let to Bonneville and this was the means through which NLL participated in another company's project. The record would allow a conclusion that NLL would have been required to participate in such a joint venture arrangement even without regard to conduct on the part of the Bank.

There was evidence presented indicating that other factors entered into the company's profitability in the years 1983 and following. Mr. Bottrell testified that the workload for 1983 prior to the set-off was lighter than usual. Additionally, Mountain Bell had begun accepting bids from non-union bidders, making it difficult for NLL to bid competitively since it paid union wages. Mountain Bell had cut its RTIP contracts in half; thus there were less available projects to bid on. In addition, all of the 1983 RTIP contracts had already been awarded by June of 1983.

Even though we accept the evidence which demonstrates a breach of obligation on the part of the Bank, the amount of any damage arising from that breach was actually left to speculation. In addition to the Bonneville joint venture, there was testimony that NLL paid $130,500 to Morrises through the joint-venture arrangement, but there is nothing to show how that was specifically related to the conduct of the Bank.

Here NLL had an accountant familiar with the books and records of the corporation who testified only as to years prior to the time in controversy. Had he been given the opportunity to do so, that accountant could have reviewed the

books and records of NLL and submitted direct testimony of the net profits earned in 1983, 1984 and any other relevant year. Obviously NLL chose not to submit that kind of information. Instead it made loose references to gross profit figures which were large in amount. Witnesses referred to the value of NLL and argued for reimbursement for the damage done to NLL which had been forced out of business. Clearly NLL chose not to offer specific evidence of lost profits and other actual losses. I can only assume that its choice arose from a prior conclusion that there were not sufficient losses to justify a substantial award.

I therefore disagree with the $312,000 damage award. Such an award affirms the trial procedure used here. By focusing on the claimed outrageous conduct on the part of the Bank, NLL was successful in convincing the jury that a significant amount of compensatory damages was required. It seems likely that something in the nature of a penalty or punitive aspect was included. Regardless of any sense of outrage on the part of the jury, the record fails to disclose adequate evidence of compensatory damage. I would vacate the compensatory damage award of $500,000 and remand for a new trial.

I will now discuss the $140,000 demand note. The District Court determined as a matter of law that the note was not a demand note, and the majority has reached the same conclusion. I do not agree. The language of the $140,000 note clearly states, "Upon demand, Borrower promises to pay to Bank." The instrument also states, "If no demand is made, Borrower shall pay 120 days after the date of this note." It also recites an actual due date of 10-4-83. These statements are consistent with each other. To state that payment is due

42

in 120 days does not mean that the financial institution could not demand payment prior to the 120 days.

The majority finds that the due date takes this note out of the § 30-3-108, MCA, definition of a demand note. However, the statutory definition is not this narrow. In referring to this same definition the Oregon Supreme Court in Seattle-First Nat. Bank. v. Schriber (Or.App. 1978), 580 P.2d 1012, 1013, stated, "The drafters obviously felt no need to state the obvious, that demand instruments also include instruments made expressly payable 'on demand'." Initially therefore the note in question meets the definition of a demand note.

Courts have held as a matter of law that a note with similar language is a demand note. In Rogers v. Security Bank of Manchester (8th Cir. 1981), 658 F.2d 638, the borrower argued that a payment schedule contained in the note demonstrated an intent that the note was to be an installment obligation. The court, however, refused to ignore the language of the note which stated "on demand and until demand be made." The court concluded that the payment schedule only clarified how the debt should be paid, assuming no demand was made. Rogers, 658 F.2d at 639. This is comparable to the present note which only requires payment in 120 days assuming no demand has been previously made.

The Fifth Circuit also upheld a determination that a promissory note was a demand note in International City Bank and Trust Co. v. Morgan (5th Cir. 1982), 675 F.2d 666. In that case two notes contained language stating "payable on demand or two years after date." On each note a due date was typed in the margin. On a summary judgment motion, the District Court ruled that the language, even coupled with the marginal due dates, was clear and unambiguous, constituting a

43

demand note. The federal court upheld this determination, stating "the notes were payable on demand, and in the absence of a demand, two years after execution." Morgan, 675 F.2d at 668. Again this is directly comparable to the present note.

Courts finding that inconsistent language brings a note out of demand status, often consider several factors which would tend to negate the demand nature. See Shaughnessy v. Mark Twain State Bank (Mo.App. 1986), 715 S.W.2d 944, (where a deed of trust securing the note listed eight events of default and a modification and extension of the note did not contain the word "demand"); Reese v. First Missouri Bank & Trust Co. (Mo.App. 1984), 664 S.W.2d 530, (holding that a note which stated "upon demand", yet set out a specific repayment schedule, was not a demand note).

At a minimum, the nature of the note was a jury issue. In Schriber, the Oregon Supreme Court remanded for a jury determination of whether the instrument was a demand note. In that case the note was payable "on demand, but no later than 180 days." As in the present case, a due date had been typed in. The court stated that this language "creates an ambiguity not susceptible to resolution as a matter of law." Schriber, 580 P.2d at 1013.

The majority also calls attention to the language in the note which calls for an increase in the interest rate upon default. This however, does not take the note out of demand status, but may mean that an actual demand is necessary. Peterson, 432 P.2d at 451. See also Bank of Nevada v. United States (9th Cir. 1958), 251 F.2d 820, 827; 10 C.J.S. Bills and Notes § 247 (1938).

The majority goes on to state that no actual demand was made. I disagree with that conclusion. Initially, it should be emphasized that no demand is necessary to mature a demand

44

note. "As a general rule, notes payable on demand are due and payable immediately after execution, and no further demand is necessary to mature them." Peterson, 432 P.2d at 451. Further, the note signed by NLL specifically stated, "Borrower waives presentment, demand for payment, protest, notice of dishonor, and notice of every other kind." Thus under the wording of the note, demand was unnecessary. The majority disregards this express contractual provision.

However, even if actual demand were necessary, the set-off itself constituted a demand. This was an affirmative action by the Bank sufficient to put NLL on notice that payment was due. It is difficult to conceive of a method which would more clearly convey to the borrower that payment of the indebtedness was being demanded. In Peterson, cited by the majority, a letter which called for complete liquidation of indebtedness was sufficient demand to put parties on notice that payment was due. In the present case, the Bank notified Mr. Bottrell and Mr. Reeves on July 20, 1983 that its bank account in the amount of $66,000 had been set off against this note. In substance both Mr. Bottrell and Mr. Reeves were advised directly that their $66,000 had been taken by the Bank and applied on the note. This clearly conveyed a demand for payment to NLL. Both bankers testified that the note was due at that point. Mr. Reeves testified that had NLL been able to shore up the note with additional collateral, money, or a guarantor, the note would have been rewritten, but in any event, note 14463 was due. I conclude that the set-off by the Bank was sufficient to constitute a demand for payment.

Even though the majority does not accept my analysis of the demand nature of the note or the making of a demand, I do not understand how these become issues of law. At a minimum

45

it appears that the questions to be submitted to the jury should include whether or not this was a demand note and whether or not an actual demand had been made.

The status of the note also governs the Bank's right of set-off. Since a demand note is a matured obligation, the Bank can exercise its right of set-off at any time. Allied Sheet Metal Fab., Inc. v. Peoples National Bank (WA.App. 1974), 518 P.2d 734.

Furthermore, the majority states that even if the security agreement applied to this note, the Bank must exhaust the collateral before exercising its right of set-off. While Montana has not addressed this issue, the majority rule was expressed in Allied Sheet Metal, as follows:

> Allied argues, however, that the foregoing general rule permitting a setoff in the case of a demand note does not apply until after the bank exhausts its primary collateral security, and Peoples failed to do this. In this regard, Allied relies primarily upon an early California case, McKean v. German-American Sav. Bank, 118 Cal. 334, 50 P. 656 (1897); however, McKean states a minority view, and we decline to follow it. The position adopted by the majority of modern jurisdictions is well expressed in Olsen v. Valley Nat'l Bank, 91 Ill.App.2d 365, 371, 234 N.E.2d 547, 550 (1968), as follows:
>
>> A bank should not be deprived of its right of set-off simply because it has the foresight to obtain collateral in exchange for obligations owed to it. The majority rule, including Illinois, is founded on the rationale that a creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied. The minority rule is based upon the rule or statute that there is but one action for the recovery of a debt which is secured by collateral.

518 P.2d at 739.

Accordingly, I would conclude that the Bank was not required to exhaust the collateral before setting-off the deposit. As a demand instrument, the note was mature, and the borrowers waived actual demand. I would therefore conclude that the Bank properly and lawfully exercised its right of set-off against this note.

I would reverse the judgment and remand for new trial.

_____
Justice

Mr. Justice L. C. Gulbrandson concurs in the foregoing dissent.

_____
Justice

Mr. Chief Justice J. A. Turnage concurs in the foregoing dissent of Mr. Justice Weber.

_____
Chief Justice

47

Mr. Justice John C. Sheehy, concurring specially:


> 26-1-201. Questions of law. Except as provided in Art. II, section 7, [liable or slander] of the Montana Constitution, all questions of law, including the admissibility of testimony, the facts preliminary to such admission, the construction of statutes and other writings, and other rules of evidence, must be decided by the court. (Emphasis added.)
>
> . . .
>
> 26-1-202. Questions of fact. If a trial is by jury, all questions of fact other than those mentioned in 26-1-201 must be decided by the jury, and all evidence must be addressed to them, except as otherwise provided by law . . .

There is a curious ambivalence in the dissent. The dissenters, dissatisfied with the finding of the majority that this case did not involve a demand note, now contend that whether it was a demand note is a question of fact for the jury. The "construction" or legal effect of the writing as to a demand note here is a question of law, wholly to be determined by the court. The dissenters want a jury to decide this question of law.

The recitation in the dissent of the alleged financial problems of NLL ignores the conflicting evidence, some of which is catalogued in the majority opinion, and particularly ignores the appellate rule that where there is conflicting evidence in the record, the credibility and weight to be given the evidence is in the premise of the jury and not the Supreme Court, Anderson v. Jacqueth (1983), 205 Mont. 493, 668 P.2d 1063, and that in examining the sufficiency of the evidence, the reviewer thereof will do so in a light most

favorable to the prevailing party, presuming that the jury findings are correct. Gilmore v. Mulvihill (1940), 109 Mont. 601, 98 P.2d 335. The decision on questions of fact based on conflicting evidence is peculiarly within the province of the jury. The dissent wants questions of fact to be decided by the court.

The very heart of NLL's case against the Bank is that the instrument in question was not a demand note. Recognizing this, the dissenters, giving no regard to the language of the note, the decisions of courts interpreting that exact language, and the provisions of the Uniform Commercial Code persist in calling the instrument here a demand note.

It is clear that the instrument, a copy of which is affixed to the majority opinion, does not fit the definition of a demand instrument in § 30-3-108, MCA.

It is equally clear that the instrument in question fits the definition of an instrument payable at a definite time:

> 30-3-109. Definite time. (1) An instrument is payable at a definite time if by its terms it is payable:
>
> (a) on or before a stated date or at a fixed period after a stated date; or
>
> (b) at a fixed period after sight; or
>
> (c) at a definite time subject to any acceleration; or . . . (Emphasis added.)

The instrument at bar is clearly a note payable at a definite time under the foregoing definition. It contains a stated date when it is due and that definite time is subject to an acceleration by the Bank, by making a demand.

Typewritten into the note are the due date "10-4-83," and the figures "120," setting the days after the date of the note when it is payable if no demand is made. The dissenters

-49-

claim that the note is ambiguous. Yet, if it were ambiguous, under the UCC, handwritten terms control typewritten and printed terms, and typewritten control printed. Section 30-3-118(b), MCA.

The dissenters ignore the language contained in the note, "upon default, the bank may declare the entire unpaid principal and accrued interest immediately due, without notice, and borrower must then pay that amount." An acceleration clause is completely inconsistent with a demand instrument.

Because this instrument provides that "if no demand is made, borrower shall pay 120 days after the date of this note" by the very terms of the note, an actual demand is necessary to mature the promissory note. Peterson v. Valley National Bank of Phoenix (Ariz. 1967), 432 P.2d 446, 451. Additional authority construing such instruments as not to be demand notes may be found in Shaughnessy v. Mark Twain State Bank (Mo. App. 1986), 715 S.W.2d 944, 951-52. That case also cites Reese v. Fort Missouri Bank and Trust Company (Mo. App. 1983), 664 S.W.2d 530.

The weakness of the dissenter's position as to the nature of this note is shown in its discussion of the language of the note which calls for an increase in interest upon default. Their cited cases indicate that such a provision means that an actual demand is necessary. It sounds paradoxical, but if an actual demand is necessary, the instrument is no longer a demand note. A cause of action against a maker of a demand instrument accrues upon its date, and no further demand is necessary. Section 30-3-122, MCA.

I interpose this special concurrence because otherwise the assertions in the dissent might go unchallenged.

John L. Sheehy

-50-

# CORRECTION

S.C. # 87-209

Date July 17, 1989

EDITORIAL DEPARTMENT
West Publishing Co., P.O. Box 3526, St. Paul, MN 55165

Please make the following correction in the opinion in the case of:

Title: Bottrell v American Bank

Vol. 773 Rptr. Pacific Second Page 717

In second column, line 7-8 from top.

[ heave or slander ]

should read [ libel or slander ]

Signed John C. Sheehy

The expense of making changes is such that we cannot undertake it for items of merely typographical style.

West Publishing Co.

N182c

FILED
'89 JUL 17 PM 4 06
ED SMITH CLERK
MONTANA SUPREME COURT